IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| JEREMY SALSBURG; XDG TRADING, LLC; EAGLE'S VIEW PARTNERS, LTD.; EAGLE'S VIEW MANAGEMENT, LP; and FIRST HORIZON BANK AS TRUSTEE FOR JET SUPPORT SERVICES, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> INVESCO CAPITAL MANAGEMENT, LLC. <br><br> Defendant. | Case No. 1:21-CV-06343 <br><br> Hon. Matthew F. Kennelly |

**DECLARATION OF KEITH A. PALZER
IN SUPPORT OF DEFENDANT
INVESCO CAPITAL MANAGEMENT, LLC'S PROPOSED
<u>REVISED CONFIDENTIALITY ORDER</u>**

February 10, 2023

1.　I, Keith A. Palzer, hereby declare, pursuant to 28 U.S.C. § 1746, that the following facts are true and accurate to the best of my knowledge and belief. The opinions I express herein are based on my professional experience in financial markets trading, trading investigations, and trading litigation, and my preliminary review of the pleadings, record, and a limited set of discovery materials provided to me by Ropes & Gray LLP in connection with this engagement and after I signed the

Acknowledgement and Agreement to Be Bound by the Confidentiality Order entered on February 3, 2022, in this case.

2. I am a Senior Managing Director at Ankura Consulting Group, LLC ("Ankura"), an expert services, consulting, and financial advisory firm of more than 1,800 professionals, where I am a partner in the Financial Services Disputes team within the Disputes and Economics division, as well as an investment banker in Ankura's U.S. registered broker-dealer (which only does M&A and has no trading business).

3. I have been retained by Ropes & Gray LLP ("counsel") on behalf of Defendant Invesco Capital Management, LLC ("Invesco") to explain my estimate of the marginal costs in defending Plaintiffs' claims against Invesco, should the Court order that all Defendant's expert work using Plaintiff Jeremy Salsburg's trading algorithm (the "Trading Algorithm") take place in a secure workroom with no internet access, as described in both Plaintiffs' Proposed Addendum to Agreed Protective Order, which was transmitted to the Court on February 1, 2023 (the "Proposed Addendum"), and in Mr. Salsburg's Declaration (the "Secure Workroom").

4. The Plaintiffs claim to have suffered damages in excess of $2,500,000 due to their reliance (through Mr. Salsburg's management of their trading) on an incorrect daily "basket file" generated for "authorized participants" (that is, market makers)

in the Invesco exchange-traded fund QQQ Trust Series 1 (the "ETF") by the fund's trustee, Bank of New York Mellon ("BNY"). The basket file initially disseminated by BNY on August 28, 2020, inaccurately reflected the share quantities of Apple and Tesla. Allegedly, Mr. Salsburg uploaded the basket file – as I would expect to be his practice – to the "Ingestion Engine" of the Trading Algorithm to implement his day-trading arbitrage program and generate long and short trades in equity stocks and the ETF's shares.

5. As explained in this declaration, I affirm as follows in respect of the parties' discovery dispute:

> *First*, Invesco's Proposed Revised Confidentiality Order is wholly sufficient to protect Mr. Salsburg's and the other Plaintiffs' economic interests in this case by keeping the Trading Algorithm confidential to a reasonable level of certainty, assuming a firm like Ankura (with an expert like me) is retained as the Defendant's liability and damages expert (the "Expert").
>
> *Second*, Plaintiffs' Proposed Addendum is unsuited for use in this case because it appears to have been copied from patent infringement cases between direct competitors, not a trading error negligence case between a trader and a noncompetitor, like here. In a patent infringement case, like the one that appears to be the source of Plaintiffs' proposed discovery addendum, an expert generally examines source code to determine whether it is like or unlike a competitor's source code that performs a similar function. Proper expert analysis in this case, however, does not involve the simple comparison of Mr. Salsburg's Trading Algorithm to any other algorithm or code. Instead, it requires the construction and maintenance of a simulated trading environment for the Trading Algorithm in which to perform analyses related to causation and damages. Plaintiffs seek to permit the Expert to conduct these analyses only in a Secure Workroom, a level of protection for a trading algorithm that I have never observed in my career in financial services litigation. This level of protection would impose enormous marginal litigation

Page 3

costs on Defendant, including incremental professional services fees estimated to be *at a minimum* between $190,000 and $245,000 (which is the basis of the request by the Court for this declaration). Plaintiffs and Defendant would also have to agree to a number of details not addressed in Plaintiffs' Proposed Addendum before the Secure Workroom would be functional. Negotiating those missing details could further increase the marginal costs of Plaintiffs' Proposed Addendum.

*Third*, although I am interested to see how Mr. Salsburg explains in his supplemental declaration, which is also due to be filed on February 10, 2023, how he thinks he and the other Plaintiffs would be harmed through disclosure of the Trading Algorithm to others, no potential competitive harm is apparent to me based on the evidence and affirmations provided to me so far.

## *My Qualifications and My Team*

6. I have substantial experience in the analysis of trading algorithms like the one used by Mr. Salsburg in his arbitrage trading. The experience was gained during a 15-year career with a global investment bank (where I managed systematic trading hedge funds, ran derivatives trading businesses, and was a trading counsel), as well as during the last ten years as a litigation consultant and investment banker at Ankura and predecessor companies. That experience includes: (a) executing equity fund arbitrage trades and launching algorithmic equity trading programs and ETFS as a senior banker within Merrill Lynch's equity derivatives business (2006-2008); (b) managing a $3 billion systematic trading hedge fund platform and investments in several third-party managed systematic trading hedge funds as a senior officer at Merrill Lynch Alternative Investments, Inc. (2008-2013); (c) expert testimony in and project leadership of more than a dozen securities and derivatives trading

engagements involving algorithmic trading since beginning my financial services consulting business in 2013; and (d) work as an investment banker at Ankura since 2018, where I manage M&A assignments for systematic trading hedge fund managers.

7. The team I intend to employ in this case (should I be named the Expert) comprises a former equity trader with substantial algorithmic trading and ETF market-making experience; equity market trading consultants with experience in quantitative finance and the Python programming language; and information technology consultants with experience in systems architecture, data management, and software design and implementation within the Python environment. (Should a different programming language be involved, I would need to restaff, but such a restaffing would not materially affect my views expressed in this declaration, including my estimate of $190,000 to $245,000 of incremental expert and consulting time.)

8. Although some members of my team and I have engaged in algorithmic trading, none of us does so currently, and we would agree to abide by the restrictions included in Invesco's Proposed Revised Confidentiality Order, as described below. My and my team's experience working with trading algorithms also gives us a deeper understanding of just how difficult and inefficient evaluating the Trading Algorithm and conducting necessary analyses in a Secure Workroom would be.

*Invesco's Proposed Order Would Protect Plaintiffs*

9. I reviewed the Proposed Revised Confidentiality Order that Invesco submitted to the Court on February 1, 2023. That proposed Revised Confidentiality Order appears wholly sufficient to protect Plaintiffs from economic damage because it minimizes any threat that the Trading Algorithm will be disclosed outside the narrow group of people permitted (pursuant to the Order's terms) to receive and review it.

10. I can speak only to Ankura's capabilities and processes, but if I were engaged as the Expert, the Trading Algorithm would not leave Ankura's secured servers or be used by anyone on the Ankura engagement team for any purposes other than the analyses necessary for this litigation. There are three reasons for this: (a) I understand that Ankura's data infrastructure security is professional grade, in the sense that we maintain litigation consulting firm security and data integrity controls that meet or exceed industry standards; (b) neither I nor anyone on my team is a professional trader – and none of us is likely to be a professional trader in the future; and (c) fundamentally, my team and I scrupulously respect protective orders in litigation, recognizing that if we did not, our consulting business would likely be ruined.[1]

---

[1] Invesco's Proposed Revised Confidentiality Order contains the following protections:
    Defendant may disclose Extra Highly Confidential Information only to one testifying expert, who must be unaffiliated with Defendant. In addition to completing the certification contained in Attachment A, Acknowledgement of Understanding and Agreement to Be

11. I would expect that other experts and consulting firms of a caliber similar to Ankura's would, if presented with this case and the opportunity to be engaged as an Expert, make similar affirmations about the sufficiency of Invesco's Proposed Revised Confidentiality Order based on those other firms' own experiences and technological capabilities.

12. As an expert and a financial services litigation consultant, I have frequently been exposed to and worked with the type of code that I understand is included in the Trading Algorithm, including:

- Work on an algorithmic trading-program arbitration between two direct competitors whereby it was alleged that my client's set of code was substantially derived from the plaintiff's code (our respondent-client being a former employee of the plaintiff);

---

Bound, the expert who reviews Extra Highly Confidential Information shall sign a representation confirming the following: (i) the expert and the expert's firm have no overlapping employees or other affiliation with Defendant or any of Defendant's affiliates; (ii) the expert and the expert's consulting staff are not professional traders who execute trading strategies on behalf of individual or corporate clients, including but not limited to algorithm trading involving index exchange traded funds (ETFs), or who otherwise compete with Plaintiff Salsburg; (iii) the expert, the expert's consulting staff, and the expert's firm shall not use trade secrets obtained from review of Extra Highly Confidential Information to conduct any trading activity; and (iv) the expert's firm shall provide notice to plaintiffs of any change in professional trader status within three years by any consultants (including expert) who accessed Highly Confidential Information. For the avoidance of doubt, an expert is not "affiliated" with Defendant or Defendant's affiliates for purposes of this Order merely because Defendant, Defendant's affiliates, or Defendant's counsel retains the expert in this or other litigation.

- An SEC enforcement investigation of a U.S. investment fund board's oversight of an index/ETF options trading manager's risk management function, in which I opined on the adequacy of risk management supervision and control of trading algorithms;

- Execution of protective orders in two other algorithmic projects in which my team and I agreed to non-disclosure and non-usage of trade secrets discovered in the case; and

- My assent to non-disclosure agreements (in my past role as a hedge fund manager and my present role as an investment banker) to trading information from more than two-dozen systematic hedge-fund trading managers, in which I had access to source code and trade history of algorithmic programs.

13. Only in the first case immediately above – where theft of source code by a direct competitor was at issue – was a secure room required to protect the code. In none of these cases was a simulated trading desk required to be built, as in this case.

14. Most importantly, I have never witnessed or heard of such a requirement in my financial services career.

15. I understand that Mr. Salsburg believes the Secure Workroom conditions are necessary because any other confidentiality protocols would result in an unacceptably high risk that the algorithm would be disclosed. I disagree. As an expert, I consistently have access to and analyze trade secrets, highly confidential

financial information, and other sensitive materials. My colleagues and I are used to agreeing to be bound by confidentiality orders that stop short of Secure Workroom conditions, and we are used to complying with them. We frequently receive and review highly confidential information using secure file transfers, encoded disks, encrypted files, and two-factor authentication.

16. Defendant's Proposed Revised Confidentiality Order provides complete protection of Plaintiffs' Trading Algorithm while still allowing Defendant to fairly and fully analyze that algorithm.

***Plaintiffs' Proposed Order Would Cause Substantial Inefficiencies and Would Need to Be Significantly Modified to Allow Invesco to Develop Its Defenses.***

17. Plaintiffs' Proposed Addendum is ill-suited for this case. This is not surprising, as significant portions of the draft have apparently been lifted from a protective order in the patent infringement case, *Arigna Tech. v. Google LLC*,[2] as well as other intellectual property cases. Intellectual property infringement cases, including the case I participated in mentioned in the previous section, involve one competitor taking software from another. Those cases are not analogous to an algorithmic trading negligence case because the alleged tortfeasor (Invesco) does not compete with Mr. Salsburg, as noted below.

---

[2] W.D. Tex. 6:21-cv-1045-ADA; Order Regarding Protective Order (Apr. 12, 2022), available at link, last checked today.

18. Plaintiffs' proposed order is also wholly inappropriate because it does not provide the Expert and the Expert's consulting team a simulated trading environment in the Secure Workroom, which is essential to permit the Expert to fully establish causation and estimate damages from Invesco's purported breach.

19. Access to a simulated trading environment is critical to Invesco's defense because Plaintiffs claim that, due to their "reliance on Defendant's faulty data, [they] suffered substantial damages in excess of $2,500,000.00." *E.g.*, Dkt. 1-1 ¶ 36. Plaintiffs allege that those damages were borne because Plaintiffs "made trades algorithmically relying on [the] data file." *Id.* ¶ 26. Thus, not only must the Ingestion Engine be fully assessed, but the other parts of the Trading Algorithm must also be analyzed in order to ascertain whether the Defendant's alleged data error (which was harmless in and of itself) actually caused Plaintiffs' alleged damages.

20. Therefore, access to the entire Trading Algorithm (and not just the Ingestion Engine) in a simulated trading environment – including the ability to test, run, and manipulate the Trading Algorithm's trade selection and trade execution engines – is fundamental to the Expert's work in this matter, including conducting analysis in at least three areas:

- *First,* the Expert will need to validate Plaintiffs' trading history through back-testing of the Trading Algorithm using trading data. In other words, the Expert will need to determine if the Trading Algorithm was running as

expected and what the expected profit and loss would have been on August 31, 2020, had there been no errors in the basket file.

- *Second,* the Expert needs to evaluate loss causation to determine (i) whether the inaccurate information in the August 28, 2020, basket file could have caused the losses allegedly incurred by Plaintiffs on August 31, 2020; and (ii) whether *other* factors, including errors in the Trading Algorithm's code, other market events, or other data anomalies may have also or alternatively caused those losses.

- *Third*, the Expert will need to quantify any damages alleged by Plaintiffs in this matter. It is critical that the Expert be able to use the Ingestion Engine and Trading Algorithm to substantiate Plaintiffs' alleged damages and generate multiple alternative trading scenarios to establish what Plaintiffs' profits and losses would have been on August 31, 2020, "but for" the basket file error.[3]

---

[3] Alternative trading scenarios include (but are not limited to) inputting the updated basket file into the algorithm both: (a) before the start of trading on August 31, 2020 (which is when I understand it was disseminated by BNY to the market); and (b) at 11:00 AM on August 31, 2020 (which is when the complaint alleges the basket file was issued to Mr. Salsburg). We would also run scenarios testing the Trading Algorithm's sensitivity to stock splits generally and its sensitivity to stocks with highly abnormal returns following splits, since on August 31, 2020, Tesla gained more than 12 percent and Apple more than 3 percent.

Page 11

21. These analyses are all complicated, time-consuming workstreams. To perform them, the Expert and the Expert's team will need at the very minimum to: (i) closely study the Trading Algorithm to determine how it operates and the logic it uses to recommend trades; (ii) test and debug the Trading Algorithm to make sure that it runs properly in the Secure Workroom; (iii) have access to and test the trade data libraries that Mr. Salsburg used at the time of the alleged basket error; (iv) create multiple sample datasets to evaluate the Trading Algorithm under different scenarios; (v) conduct robust scenario analyses and modeling to determine whether there are trades Mr. Salsburg could have executed to mitigate Plaintiffs' alleged damages; and (vi) manipulate the Trading Algorithm to determine how Plaintiffs' alleged losses might have changed had Mr. Salsburg built in error-checks or identified the basket file's error sooner than he did.

22. While Plaintiffs are willing to produce the Ingestion Engine pursuant to the parties' existing confidentiality order, in the parties' recent Joint Status Report, Plaintiffs assert that they will only agree to produce the remainder of the Trading Algorithm in their proposed version of the Secure Workroom.

23. Mr. Salsburg asserts that the Trading Algorithm consists of 100,000 lines of complex code. Based on that assertion, Plaintiffs' Proposed Addendum, as currently drafted, would not permit the analyses I described earlier to be conducted efficiently.

24. Indeed, without significant further modifications to the Proposed Addendum, some of the analyses would be extremely impractical or even impossible. Based on my review of the Plaintiffs' Proposed Addendum, Plaintiffs would need to agree to at least the following modifications in order to permit the Expert to fully and adequately analyze liability and damages:

- Provide access to multiple computers (not just one computer), with the Trading Algorithm and market data files used by Mr. Salsburg in August 2020 preinstalled;

- Enable the use of a local server and compiler program, which will permit running the Trading Algorithm on the stand-alone computers;

- Impose no limit on the number of people on the Expert's consulting team with access to the secure room (but a limit of 4 people simultaneously present in the room);

- Permit the Expert to bring data into the secure room and bring electronic output (not just printed versions) back to the office for analysis and drafting; and

- Prohibit Plaintiffs from accessing the Expert's work product or work logs, which I understand to be privileged.

***Even If the Plaintiffs' Proposed Addendum Were Properly Modified, the Secure Workroom Would Still Impose Significant Marginal Costs***

25. Even after modification of Plaintiffs' Proposed Addendum and Secure Workroom proposal, as suggested above, the resulting discovery process would make the Expert's analyses substantially harder and thus significantly more expensive in terms of hourly expert and consulting services rates to Invesco. I estimate these costs to be *at a minimum* between $190,000 and $245,000. This estimate comprises: (a) unlimited intermittent access over an 8-week period to the Secure Workroom by me and my entire consulting staff; and (b) aggregate *additional* billable time (that is, time that would not otherwise need to be devoted to this engagement) by my staff equal to two full-time equivalent consultants over 10-15 business days, billing ten hours a day, at the rate of one Managing Director ($695 an hour) and one Senior Associate (at $415 an hour) per day.

26. There are three main reasons that my team's aggregate billable time would increase as a result of the Secure Workroom review. *First*, there are inherent inefficiencies in a Secure Workroom review, including learning a new technology infrastructure, shuttling team members with the skillset best suited to a particular task into and out of the Secure Workroom, and being forced to comply with a schedule imposed by a third party, all of which could result in knowledge loss or analysts being forced to stop tasks midstream. *Second*, the Secure Workroom

procedures would make the synthesis and sharing of the results of the Expert's analyses for use at depositions, in the expert report, in dispositive motions, and at trial significantly more expensive and inefficient. If the Expert can remove nothing but written notes, the Expert will need to take and keep detailed notes regarding the results of tests on the Trading Algorithm, including back-testing, loss causation, and damages runs, so that the Expert can refer to them without access to the algorithm months in the future. That additional notetaking and documentation would be unnecessary if the Expert were allowed to analyze the Trading Algorithm in the Expert's own offices. *Third*, typically, an expert would expect to be able to perform analyses iteratively, performing additional tests or modeling additional scenarios in real time depending on how the facts develop. The Secure Workroom procedures would make this type of iteration significantly more expensive because the Expert may not have access to the data sources the Expert would need to change plans midstream.

27. My marginal cost estimate includes *only the incremental time* due to the added inconvenience of working in the Secure Workroom. It does not include the costs of designing and constructing the Secure Workroom or the additional time required to follow the as-yet formulated Secure Workroom operating and access procedures to ensure that Mr. Salsburg's Trading Algorithm remains safe and that the Expert's

work is not discoverable by Plaintiffs or their experts prior to submission of his report.

28. Such costs of design and construction – which I understand will be at Plaintiffs' expense – will include: (a) negotiation of the technical parameters by Plaintiffs' and Defendant's technology experts; (b) obtaining secure office space and hardware for the lifespan of the Secure Workroom; (c) procurement and building of the systems infrastructure (the hardware and software comprising the infrastructure either via purchase, lease, or licensing) by an information technology consultant (presumably of the Plaintiffs' own choosing, although Ankura would be pleased to serve this role); and (d) certification by my own information technology consultant that the workroom's infrastructure is built and performs to specifications.

29. Further, my incremental cost estimate of time does not include additional pre-analysis planning and expenses to ensure that the Expert arrived prepared for an unknown trading algorithm on the first day of Secure Workroom access. For example, the Expert will need to develop, administer, and analyze a pre-review survey and information sheet provided to Plaintiffs that will include questions about the algorithm's programming language and its functionality, and its proprietary data libraries.

30. Critically, I assume that the version of the Trading Algorithm will be the version that existed on August 31, 2020. Mr. Salsburg should be compelled to

produce such a version under either Invesco's proposed order or Plaintiffs' Proposed Addendum (as modified above). If he does not, the costs of re-creating the Trading Algorithm as of August 31, 2020, will be significantly greater still; as will the *marginal* costs of doing that re-creation in a Secured Workroom.

31. In sum, the conditions Plaintiffs propose in their Proposed Addendum to the Agreed Confidentiality Order, even properly modified, will impose a substantial burden on the Expert's ability to conduct an adequate analysis on Defendant's behalf of Plaintiffs' claims at a reasonable cost.

***Risk of Economic Harm to Mr. Salsburg and the Other Plaintiffs Is Not Apparent***

32. Finally, I understand that Mr. Salsburg believes the Secure Workroom conditions are necessary because Invesco competes with him in QQQ ETF arbitrage day trading. Invesco almost certainly does not. And other economic harm from disclosure of the Trading Algorithm is not apparent to me.

33. In respect of competition with Invesco, my understanding – based on Mr. Salsburg's current SEC filings as a registered investment adviser – is that his trade management business currently has approximately $75 million of client assets under management.

34. Based on the documents made available to me to date and his prior declaration in this discovery dispute, Mr. Salsburg's investment strategy is profiting through day-trading of individual components of the QQQ based on momentary price

differentials of those components against the ETF itself. (It may also arbitrage against other ETFs, but this is not clearly established.)

35. Although I will of course inquire with Invesco if I am engaged as the Expert in this case, at this point I find it extremely unlikely that Invesco would ever manage an investment strategy for clients that arbitrages against its own managed ETF, QQQ.

36. QQQ is one of the largest and most successful ETFs in the U.S. market. The compliance measures Invesco would need to arbitrage its own fund would make such an investment business embarrassing, if not cause a violation of the Investment Advisers Act of 1940, as amended. (This assertion is based on my work on behalf of the U.S. Securities and Exchange Commission on investment advisory conflicts of interest in the case *U.S. Securities and Exchange Commission v. Stuart Frost*, in the Central District of California.)

37. I also find it improbable that Invesco, which runs funds worldwide valued at more than $1.4 trillion as of today, would ever compete with Mr. Salsburg in such a business (with $75 million under management).

38. Further to that end, I believe Mr. Salsburg's assertion that the Invesco India Arbitrage Fund (Bloomberg Professional Service Ticker RINARDG <Equity>) could use his Trading Algorithm to compete with him to be entirely unsupported. This Invesco fund manages approximately $360 million in Indian rupee (converted

from Indian rupee to U.S. dollars at the rate of 82 rupee to 1 dollar). It is a strategy that arbitrages cash equities against derivatives, solely in the Indian local securities market. Mr. Salsburg does not appear through his regulatory filings to trade in Indian stock and based on my analysis of their holdings today, the India fund does not trade in the United States. Thus, even if the India fund obtained the Trading Algorithm, it would be unlikely to be able to use it: unless the fund or Mr. Salsburg changes their investment strategy, competition between the two will never develop.

    Respectfully Submitted,

    /s/ Keith A. Palzer

    _____

    Keith A. Palzer