IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| JEREMY SALSBURG; XDG TRADING, LLC; EAGLE'S VIEW PARTNERS, LTD.; EAGLE'S VIEW MANAGEMENT, LP; and FIRST HORIZON BANK AS TRUSTEE FOR JET SUPPORT SERVICES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> INVESCO CAPITAL MANAGEMENT, LLC. <br><br> Defendant. | Case No. 1:21-CV-06343 <br><br> Hon. Matthew F. Kennelly |

**DEFENDANT INVESCO CAPITAL MANAGEMENT, LLC'S
LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Invesco Capital Management, LLC ("Invesco"), by and through its undersigned attorneys, submits this statement of material facts pursuant to Local Rule 56.1(a) and Federal Rule of Civil Procedure 56(c)(1) in support of its Motion for Summary Judgment.[1]

**I. THE QQQ TRUST.**

  A. *ETFs, The Trust, the Index, and Invesco QQQ Shares.*

1. Invesco is one of the world's largest sponsors of ETFs. Exhibit 1, Declaration of Rudolf Reitmann (hereinafter, "Reitmann Declaration"), ¶ 3.

2. ETFs are bundles of securities that individual investors can buy or sell on exchanges that track the outcome of a broader set of investments, including stocks, bonds, currencies, futures contracts, or commodities such as gold and oil. *Id*.

---

[1] This Local Rule 56.1 Statement of Material Facts incorporates all definitions and facts set forth in the parties' Joint Stipulated Statement of Facts ("JSF") filed with the Court on May 11, 2023. *See* Dkt. 93.

3. ETF sponsors buy the ETF's underlying investments on behalf of, and as agent for, the ETF; a trustee manages the administration of the ETF and its portfolio, including by dividing the ownership of the ETF—and therefore indirect ownership of those investments—into shares and selling them to and repurchasing them in bulk from authorized participants. *Id*. at ¶ 4.

4. In turn, the authorized participants divide the bulk shares—called creation units— and sell them to investors, called beneficial owners. *Id*.

5. When purchasing an individual share, a beneficial owner obtains a small interest in the ETF's overall investment, but individual beneficial owners never transact directly with the trustee, the sponsor, or the trust (unless the beneficial owner is also an authorized participant). *Id*.

6. One of Invesco's largest ETFs is the Invesco QQQ Trust, Series 1 (the "Trust"), which holds a portfolio (the "Portfolio") of shares of the 100 largest non-financial companies on the Nasdaq exchange. *Id*. at ¶¶ 6-7.

7. The Trust's Portfolio is structured to seek to track the investment results and mirror the performance (before fees and expenses) of the Nasdaq-100 Index (the "Index"). *Id*. at ¶ 6.

8. The companies that comprise the Index are at the forefront of transformative innovation, including in augmented reality, cloud computing, big data, mobile payments, streaming services, and electric vehicles. *Id*. at ¶ 7.

9. By purchasing a single share in the Trust (a "QQQ Share"), the Trust's beneficial owners ("Beneficial Owners") thus gain investment exposure to Microsoft, Apple, Alphabet, Amazon, Meta, and other leading companies across a variety of sectors and industries. *Id*. at ¶¶ 7-8.

10. The Trust is the highest-rated large-cap growth fund based on total returns over the past 15 years and is the nation's second-most traded ETF. *Id*. at ¶¶ 6-7.

11. There are hundreds of millions of outstanding QQQ Shares owned by millions of individual Beneficial Owners. *Id.* at ¶ 8.

B. *Authorized Participants, DTC Participants, NAV, and Arbitrage Trading.*

12. Only two groups of market participants can directly create or redeem bulk shares (called "Creation Units") in the Trust: contractually established Authorized Participants and DTC Participants. *See* Exhibit 2, Joint Stipulated Statement of Undisputed Facts, Dkt. No. 9 (filed May 11, 2023) (hereinafter, "JSF"), ¶ 19; *see also* Exhibit 1, Reitmann Declaration, ¶ 10.

13. The creation or redemption of Creation Units by Authorized Participants and DTC Participants is designed to help move the market price of an Invesco QQQ Share toward its net asset value ("NAV"). Exhibit 2, JSF ¶ 20; *see also* Exhibit 1, Reitmann Declaration, ¶ 14.

14. Usually, the NAV and the market price align because Authorized Participants and DTC Participants, who buy and sell Creation Units, would otherwise arbitrage away price differences. Exhibit 1, Reitmann Declaration, ¶ 15.

15. Specifically, when the market price of a share of the Trust exceeds its NAV, Authorized Participants and DTC Participants buy the components of the Trust's Portfolio and use them to create Creation Units, increasing supply of the Trust's shares and reducing their cost; inversely, when the market price of a share of the Trust is below its NAV, Authorized Participants and DTC Participants redeem Creation Units for the component stocks, reducing supply of the Trust's shares and increasing their price. *Id.*

16. When market conditions do cause the NAV and the market price to diverge, Authorized Participants and DTC Participants use the same arbitrage process, which has the effect of generally keeping the NAV and the market price in equilibrium. *Id.* at ¶ 16.

17. Arbitrage trading by Authorized Participants and DTC Participants thus benefits the Trust because the closer a QQQ Share's market price approximates its NAV, the more attractive the Trust is to investors hoping to mimic the Nasdaq-100 Index's returns. *Id*.

18. Because the arbitrage mechanism relies on the creation or redemption of QQQ Shares to calibrate supply and demand, only Authorized Participants and DTC Participants play that beneficial equilibrating role. *Id*.

C. *The Purpose of Basket File, BNYM, and the Trust Agreement.*

19. Creation and redemption of Creation Units by Authorized Participants and DTC Participants is governed by a "Basket File." *Id*. at ¶ 14; *see also* Exhibit 3, Declaration of Allison Mike (hereinafter, "Mike Declaration"), ¶ 6.

20. The Basket File is an offer indicating the mix of stocks and cash that the Trustee is willing to accept to create a Creation Unit in the Trust, or to provide in exchange for the redemption of a Creation Unit. Exhibit 1, Reitmann Declaration, ¶¶ 10, 11; *see also* Exhibit 3, Mike Declaration, ¶¶ 6, 11.

21. While a Basket File indicates the terms on which Authorized Participants or DTC Participants can expect to create or redeem Creation Units on a given day, it is not an objectively verifiable representation about what the Trust's portfolio contains at any given moment. Exhibit 1, Reitmann Declaration, ¶ 11; *see also* Exhibit 3, Mike Declaration, ¶ 7.

22. A Basket File is not intended to provide any market participant other than Authorized Participants and DTC Participants with data to inform secondary market trading. Exhibit 1, Reitmann Declaration, ¶ 17.

23. According to the governing Trust Agreement, the Trustee (BNYM), and not Invesco, is solely responsible for calculating the Basket File, including by "calculat[ing] the number of shares" in the Basket File "tak[ing into] account . . . stock split[s]," and transmitting the

4

Basket File to the National Securities Clearing Corporation ("NSCC"), the Trust's data and clearing house, prior to the commencement of trading. Exhibit 4, Standard Terms and Conditions of Trust (hereinafter, "Trust Agreement"), Dkt. 12-1, §§ 2.04(g), 2.04(k).

24. Invesco reviews the Basket File, but BNYM is solely responsible under the Trust Agreement for the Basket File's calculation. *Id*. *See also* Exhibit 5, INVESCO_000000053 (Invesco Senior ETF Port Ops Specialist stating ███████████████ )

25. According to the Trust Agreement, "the Sponsor [Invesco] . . . may rely on" the Basket File created by the Trustee, and "the Sponsor [Invesco] shall have no responsibility for the accuracy thereof." Exhibit 4, Trust Agreement, § 4.03.

26. According to the Trust Agreement, the "Sponsor [Invesco] shall in no event be deemed to have assumed or incurred any liability, duty, or obligation, to any Beneficial Owner or to the Trustee other than as expressly provided for" in the Trust Agreement. *Id*. § 7.04(a).

27. Invesco is not an advisor to the Trust and does not have any management obligations to it. Exhibit 1, Reitmann Declaration, ¶ 5.

28. Once BNYM has compiled a Basket File for the next trading day, BNYM transmits the Basket File via secure file transfer to the NSCC. Exhibit 2, JSF ¶ 18; Exhibit 3, Mike Declaration, ¶ 10.

29. Once BNYM transmits a Basket File to NSCC, BNYM has no visibility into NSCC's internal operations as they relate to posting or transmitting the Basket File. Exhibit 3, Mike Declaration, ¶ 10.

30. The next trading day, after the Index has opened for trading, Authorized Participants or DTC Participants may place orders for creation or redemption of Creation Units with BNYM. *Id*. at ¶ 11.

5

## II.     THE PLAINTIFFS.

31.     Prior to September 1, 2020, no Plaintiff was an Authorized Participant or DTC Participant under the terms of the Trust Agreement. Exhibit 2, JSF ¶ 30.

32.     Plaintiffs believed that not having to register as Authorized Participants would be a benefit of Mr. Salsburg's trading strategy. *See* Exhibit 6, emails001440 ███████████████████████████████████████████████████████████████ ██████.

33.     Prior to September 1, 2020, no Plaintiff directly created or redeemed Creation Units in the Trust. Exhibit 2, JSF ¶ 32.

34.     Prior to September 1, 2020, each Plaintiff was a Beneficial Owner of Invesco QQQ Shares, and therefore subject to the Trust Agreement. *Id*. at ¶ 34; *see also* Exhibit 4, Trust Agreement.

35.     Prior to September 1, 2020, Invesco was not an investment advisor or financial advisor to any Plaintiff. Exhibit 1, Reitmann Declaration, ¶ 5.

## III.    MR. SALSBURG'S AND XDG'S ALGORITHMIC TRADING.

36.     Because they are not Authorized Participants, Mr. Salsburg and XDG did not engage directly with the Trust to make trades. *Id*. at ¶¶ 21-22.

37.     Instead, Mr. Salsburg and XDG engaged in a risky form of arbitrage that used the information in the Basket Files to front-run the balance and value of the Trust's component stocks and the Trust's need to make trades in the market. *Id*. at ¶ 23.

38.     Such arbitrage trading does not help move the value of the Trust toward NAV, and exclusively benefits the arbitrage traders at the expense of the Trust and its millions of Beneficial Owners. *Id.* at ¶¶ 23, 26; *see also* Exhibit 7, emails001338 (████████████████████ ███████████████████

6

39. Mr. Salsburg's and XDG's arbitrage strategy against the Trust focused on premarket and after-hours trading. Exhibit 2, JSF ¶ 39.

40. Premarket and after-hours trading is a particularly high-risk form of trading because markets are less liquid during those times. Exhibit 1, Reitmann Declaration, ¶ 25.

41. According to Mr. Salsburg, his front-running strategy presented the greatest opportunities around ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓ Exhibit 8, attachment to emails001583, p. 3.

42. Prior to September 1, 2020, Invesco did not transmit the Basket File directly to any Plaintiff. Exhibit 2, JSF ¶ 35.

43. Prior to September 1, 2020, Invesco had not communicated with Mr. Salsburg or any other Plaintiff about the Basket File, arbitrage trading, or any other topic. Exhibit 2, JSF ¶ 36; *see also* Exhibit 9, Dkt. 68-1, p. 5 (Plaintiffs' counsel confirming that "[w]e don't have any communications from Invesco").

44. Invesco never encouraged or condoned Plaintiffs, or any front-running arbitrage traders, using the Basket File for their own arbitrage trades. Exhibit 1, Reitmann Declaration, ¶ 24.

45. Mr. Salsburg generally obtained the Trust's Basket File after the close of trading on each trading day from Wedbush, which received it from NSCC, which received it from BNY. Exhibit 2, JSF ¶ 40.

46. Mr. Salsburg was aware that the Basket Files were occasionally late in arriving from Wedbush. *See* Exhibit 10, emails002421 (February 19, 2020 email from Mr. Salsburg asking about a Basket File which should have been in Wedbush's File Transfer Protocol but was not: ▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); *see also* Exhibit 11, emails001577 (June 10, 2020 email informing Mr. Salsburg that the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓)

7

47. Plaintiffs were aware, prior to September 1, 2020, that inaccurate Basket File data posed a risk to Mr. Salsburg's and XDG's arbitrage trading strategy. Exhibit 2, JSF ¶ 42; *see also* Exhibit 6, emails001440 (principal of Plaintiffs Eagle's View Partners, Ltd. ("EVPL") and Eagle's View Management, LP ("EVML"), stating, ██████████████████████████████████████████████████████████████████████████.

48. Mr. Salsburg had encountered previous errors in Basket Files, including instances where Basket Files issued at the close of the trading day on Friday were not the correct ones to use for trading on Monday. *See* Exhibit 12, emails001288 (Sunday, August 23, 2020 email from Mr. Salsburg to Plaintiffs EVPL and EVML: ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; *see also* Exhibit 2, JSF ¶ 43.

49. Mr. Salsburg told the other Plaintiffs that he was ████████████ and ████████ watching for the risk of inaccurate data. *See* Exhibit 6, emails0014439 (principal of Plaintiffs EVPL and EVML, regarding risks such as ████████████████████████████████████████████████████████████████████████████████████████████).

50. Mr. Salsburg characterized his trading strategy to other Plaintiffs as being low risk. Exhibit 2, JSF ¶ 44. *see also* Exhibit 8, attachment to emails001583, p. 2 (Mr. Salsburg's investor presentation on ETF arbitrage trading, provided to a principal of Plaintiffs EVPL and EVML, stating, ████████████████████████████████████████████████████████████).

8

## IV. THE ORIGINAL & CORRECTED AUGUST 31 BASKET FILE.

51. Apple's and Tesla's stock splits were self-executing, meaning that BNYM's systems automatically accounted for them and no trading in the Trust's portfolio was necessary to continue to track the Index. Exhibit 3, Mike Declaration, ¶ 21; *see also* Exhibit 13, INVESCO_00000028 (report from BNYM describing the August 31, 2020 Basket File issue).

52. BNYM also accidentally manually rebalanced the Basket File for the stock splits, which resulted in BNYM double counting the stock splits in the Basket File that BNYM released to NSCC (the "Original August 31 Basket File") and in turn undercounting other constituent holdings. Exhibit 3, Mike Declaration, ¶ 22.

53. Mr. Salsburg was aware of the Apple and Tesla stock splits before he received the Original August 31 Basket File. Exhibit 2, JSF ¶ 53; *see also* Exhibit 14, emails001265 (August 31, 2020 email from Mr. Salsburg to EVPL and EVML: ▮▮▮▮▮)

54. Mr. Salsburg did not ask Invesco or BNYM, prior to 9:30 a.m. EDT on August 31, 2020, whether the Original August 31 Basket File accurately accounted for the Apple and Tesla stock splits. Exhibit 2, JSF ¶ 54.

55. Prior to 9:30 a.m. EDT on August 31, 2020, Invesco received multiple inquiries from other market participants who could see that the Original August 31 Basket File did not accurately reflect the Apple and Tesla stock splits. *Id*. at ¶ 55; *see also* Exhibit 15, INVESCO_000000011 (August 31, 2020, 3:37 AM EDT email from Virtu Financial LLC to Invesco: ▮▮▮▮▮)

9

██████████); Exhibit 16, INVESCO_000000021 (August 31, 2020, 8:35 EDT email from Justin Danfield (ETF Capital Markets, Invesco), providing communications from participants regarding the Basket File, including ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

56. Upon receipt of these inquiries, and prior to 9:30 a.m. EDT on August 31, 2020, Invesco contacted BNYM so that BNYM could verify the error and correct the Original August 31 Basket File. Exhibit 2, JSF ¶ 56; *see also* Exhibit 16, INVESCO_000000021.

57. In response, and prior to 9:30 a.m. EDT on August 31, 2020, BNY created a revised Basket File (the "Revised August 31 Basket File"). Exhibit 2, JSF ¶ 56; *see also* Exhibit 13, INVESCO_00000028 (report from BNY describing the August 31, 2020 Basket File issue).

58. BNY disseminated the Revised August 31 Basket File to NSCC at 9:22 a.m. EDT and followed up with a phone call to confirm that NSCC had received it. Exhibit 3, Mike Declaration, ¶ 27.

59. Invesco emailed the Revised August 31 Basket File to Authorized Participants at 9:45 a.m. EDT on August 31, 2020. *See* Exhibit 1, Reitmann Declaration, ¶ 32; Exhibit 17, INVESCO_000000003 (Invesco email with Corrected August 31 Basket File: ███████████████████████████████████████████████████████████████████████████████████████████████████████████████); *see also* Exhibit 18, BNYM_000671; Exhibit 19 (August 31, 2020 email from BNY: ████████████████████████████████████████████████████████████████████████████████████████████████).

60. Following the correction, BNYM classified this error as a ▮▮▮▮▮▮ because no Authorized Participant had used the basket file to create or redeem Creation Units. Exhibit 3, Mike Declaration, ¶ 28.

61. Had an Authorized Participant attempted to use the original, erroneous basket file to create or redeem Creation Units, BNYM would have worked directly with the Authorized Participant to settle correct shares outside of the NSCC settlement process. Exhibit 3, Mike Declaration, ¶ 29.

V. **PLAINTIFFS' AUGUST 31, 2020 TRADING & ALLEGED LOSSES.**

62. SageTrader received the Corrected August 31 Basket File from Wedbush at 10:31 a.m. EDT on August 31, 2020. *See* Exhibit 20.

63. SageTrader was not an Authorized Participant on August 31, 2020. Exhibit 2, JSF ¶ 64.

64. Plaintiffs Eagle's View Management, Ltd. and Eagle's View Partners, LP were displeased with the losses incurred by Mr. Salsburg and requested increased controls and transparency into his risk management protocols. *See* Exhibit 14, emails001266 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

65. Certain of Mr. Salsburg's clients other than Plaintiffs requested that Mr. Salsburg cease trading on their behalf after learning of the error. *See* Exhibit 21, emails003293 (August 31, 2020 email from Boothbay Management to Mr. Salsburg: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████.

66. On August 31, 2020, Mr. Salsburg was aware of additional checks that could have been implemented in his trading process ████████████████ errors like those in the Original August 31 Basket File. Exhibit 14, emails001266 (August 31, 2020 email from Mr. Salsburg to EVML and EVPL stating ████████████████████████████████████████ █████.

67. On September 1, 2020, Mr. Salsburg stated that he knew ████████████ ██████████████████ Exhibit 22, emails000901.

68. On September 2, 2020, Mr. Salsburg told his clients that he had ████████ ██████████████████████████████████████████████████████████ Exhibit 23, emails001704.

69. By September 14, 2020, Mr. Salsburg had changed his trading algorithm to add ████████████████ designed to catch errors like those in the Original August 31 Basket File. Exhibit 24, emails003276 (September 14, 2020 email exchange with Mr. Salsburg regarding his addition of ████████████████████████████████████████████████████████████ █████).

70. By September 21, 2020, Mr. Salsburg had made his trading's ████████ ██████ in order to ensure he would ████████████████████████████ again. Exhibit 25, emails001129 ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████ )

71. Those changes to the trading algorithm were available and known to Mr. Salsburg prior to August 31, 2020, and would have prevented Mr. Salsburg's losses that day. *See, e.g.,* Exhibit 14, emails001266; Exhibit 22, emails000901.

72. Plaintiffs believe that ███████████████████████████████████ ██████████████████████ and thus suffered fewer losses than Mr. Salsburg. *See* Exhibit 26, emails000923 (August 31, 2020 email from Arman Mikayelyan, principal of EVML and EVPL.)

73. However, immediately after August 31, 2020, Mr. Salsburg told his clients, including Plaintiffs, that he believed the Original August 31 Basket File was intentionally ████████████████████████████████████████ rather than the result of a failure in his risk protocols. *See* Exhibit 23, emails001705 ███████████████████████████ ████████████████████████████████████████.

74. Mr. Salsburg told JSSI that he specifically believed that the Original August 31 basket File was caused by ████████████████████ and that ████████████████ ██████████████████████████████████████████████████ *See* Exhibit 27, emails001347 (September 1, 2020 email from Mr. Salsburg to Joseph DaGrosa, principal of JSSI).

75. Mr. Salsburg also told his clients, including Plaintiffs, that he would make them whole in part by █████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ *Id.*; *see also* Exhibit 28, emails000985 (February 2, 2022 email wherein Neal Berger, principal of EVML and EVPL, writes to Mr. Salsburg: ████████████████████████████████); Exhibit 29, JSSI04072023000001

13

(September 8, 2020 email from Ken Goodman, principal of JSSI: ███████████

███████████████████████████████████████████████████████████████████████████

██████).

76. After August 31, 2020, Mr. Salsburg sought ways to receive ████████████

███████████████████████████████████████████████████████████████████████████

Exhibit 30, emails001138 (September 23, 2020 email from Mr. Salsburg to Bloomberg).

77. After August 31, 2020, Mr. Salsburg emailed Invesco representatives in order to receive Basket Files directly from Invesco, rather than from DTCC (through Wedbush and SageTrader). *See* Exhibit 2, JSF ¶ 67; *see also* Exhibit 31, emails000047 (September 2, 2020 email from Mr. Salsburg to Invesco personnel: ████████████████████████████████

███████████████████████████████████████████████████████████████████████████

█████████████████████████████████; Exhibit 32, emails000855 (September 16, 2020 email from Mr. Salsburg to other Invesco personnel: ████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████).

78. Those representatives did not respond to Mr. Salsburg's request. *Id*. *See also* Exhibit 9, p. 5 (Plaintiffs' counsel confirming that "[w]e don't have any communications from Invesco").

14

Dated: June 2, 2023 Respectfully submitted,

/s/ Nicholas M. Berg

Nicholas M. Berg
Philip P. Ehrlich
John L. Wolf
Anne C. Monjar
**ROPES & GRAY LLP**
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606
T: 312.845.1200
F: 312.845.5538
Nicholas.Berg@ropesgray.com

*Counsel for Defendant Invesco Capital Management, LLC*

**CERTIFICATE OF SERVICE**

I, Nicholas M. Berg, hereby certify that the foregoing document was electronically filed on June 2, 2023, and will be served upon the registered parties electronically via email and the Court's ECF Notice system.

/s/ Nicholas M. Berg

Nicholas M. Berg
**ROPES & GRAY LLP**
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Tel: (312) 845-1200
Fax: (312) 845-5522
Nicholas.Berg@ropesgray.com

*Attorney for Defendant Invesco Capital Management, LLC*